Reese, J.
delivered the opinion of the court.
The prisoner was convicted of murder in the first degree, and judgment of death pronounced against him in the Circuit Court for Monroe county. To reverse that judgment he has prosecuted his appeal in error to this court.
It appears from the bill of exceptions that it was proved at the trial, by William Dye and Milton' Dye, witnesses on behalf of the prosecution, that in the month of March, 1842, the prisoner, Wade Swan, the deceased, T. G. Moore, and one Joel Blackwell, the last a penitentiary convict, were assisting the witness to roll logs. While engaged in this employment the prisoner and the deceased both became intoxicated; they were friendly during the whole day, so far as witness knew. The two witnesses at the close of the day went to the house, leaving the other three in the field. When supper was ready they were called to come and partake of it, and came; both prisoner and deceased being still intoxicated. After supper the deceased took a seat by the door, and owing to his chair-post slipping through a crack of the floor, he knocked his head against the door-cheek. Witness, William Dye, asked deceased if he was *138 hurt, and he said, “not much.” The prisoner then got a torch, and as he started out of the house tripped his foot and stumbled; the deceased said, “take care and not fall.” The prisoner replied, “take care and not fall yourself,” and left the house. Witness thought prisoner had gone home; but in about two minutes he returned and called to a little boy to take his torch; witness told the boy to do so, and he took it. Witness then saw the prisoner have a hand-spike drawn in bothhands, holding it to one side and immediately stepping into the house he struck Moore,, the deceased, two or three blows on the forehead, giving him a deep cut over the left eye, two or three inches long, and breaking the bone over the eye. Witness noticed, ' also, two or three red spots on the forehead of the deceased. The deceased was setting down, with his head leaning against the wall, and made no resistance to the assault of the prisoner. This took place about 8 o’clock at night; Moore died about 9 o’clock in the morning of the next day. The hand-spike was a young gum, about or 5 feet long, and very large. Witness could have killed a horse with it, and considered it a very dangerous weapon, and is sure that the deceased came to his death by the blow inflicted by the prisoner as before stated. The deceased spoke' a very few words only after he was stricken by the prisoner. The deceased was an inoffensive man, and would not take his own part when imposed on. The deceased and prisoner had always been friendly so far as witness knew. Prisoner invited deceased to help him roll logs on the next day.
James Nicholson, another witness for the State, testified, that about 10 or 11 o’clock the next day he saw the prisoner passing by his field-six or seven miles from the place where the murder was committed; saw him run into the woods. Witness is a constable, and called to two other persons to assist him in arresting the prisoner. They pursued and overtook him. When he had arrested him, witness told him that he had lulled Moore; prisoner said he supposed he had “died damned suddenly,” as he had given him “a few pretty good taps;” that the deceased deserved them, as he had treated him “damned badly” about a twenty dollar note that Joel Blackwell had at the log rolling; prisoner said that he pronounced the note to be a counterfeit, *139 and that the deceased jerked or snatched the note out of his hands, saying he was “a damned fool and no judge of money.” The prisoner also, when arrested, stated that he was hunting his cow. There is no additional fact of any importance stated in the bill of exceptions as proved by any witness.
The question which first presents itself upon this record is, whether the facts sufficiently establish that the homicide in this case is of that “kind of wilful, deliberate, malicious, and premeditated killing,” which by the provisions of the 2d section of the act of 1829, ch. 23, will constitute the crime committed, to be murder in the first degree? The principles applicable to this grade of offence, have heretofore been laid down in the cases of Mitchell vs. The State, and Dale vs. The State, with a fullness and precision appropriately illustrated by the facts, the repetition of which, if practicable, would now be neither necessary nor useful. Those principles now rest on the solid ground of reason and authority, which need not be strengthened, and cannot hereafter be lightly disturbed. The characteristic quality of this offence, and that which distinguishes it from murder in the second degree, or any other homicide, is the existence of a settled purpose and fixed design, on the part of the assailant, that the act of assault should result in the death of the party assailed; that death being the end aimed at,- the -object sought for and wished. In the case before us, the atrocious act was unattended by the slightest trace of provocation. The unfortunate deceased, marked by a temper which neither inflicts or resists injury, was at the moment sitting silent, reclining his head against the wall, offering or meditating no wrong in word or deed, and apprehending none towards himself, when the prisoner, with brutal violence and crushing force, wielded his fearful bludgeon, deliberately sought after and obtained for that very purpose, against the life of the deceased. It is impossible, we think, to say that the settled purpose and fixed design of the prisoner, at the time of this assault, was not to take the life of the deceased. The absence of all provocation at the time, the harmless character and conduct, and the unresisting attitude of the deceased; the deliberate search for the weapon; the return with it; the quiet disposition of the torch; *140 the dangerous nature of the instrument, and the fearful manner of wielding it; all these circumstances irresistibly impress the mind with the conviction, that it was the deliberate design and purpose of the prisoner to' Lake away Moore’s life; arid, indeed, if these circumstances needed or could receive additional weight, it would be found in the fact, that the prisoner when arrested on the next day; did not even pretend that his purpose was not to take life, and he refers the killing, in point of motive, to a wrong, as he deemed it, received by him from the deceased some time previously, when they were at work in the field, for which he seemed to think those fearful blows were well merited. It is true the prisoner was intoxicated, but there is no direct attempt in the record to prove the degree of it. It does not appear, that'on account of this intoxication the prisoner did not make an effective hand at the log rolling; he came to supper when called; partook of it; prepared his torch to leave for home; looked out for the hand-spilte; offered to give up his torch; gave it up; stepped forward, with' the weapon; inflicted the blow; repeated it two or three times, and on the next day remembered the character and the motives of his acts. So we are unable to say, from any thing in this record, that the intoxication which existed produced a mental condition, which incapacitated the prisoner from the exercise of that deliberate and premeditated purpose which constitutes a necessary element of homicide, of the grade of which we have been speaking. It is true, also, that if it be possible to refer the killing, in point of motive, to the few and harmless remarks of the deceased on the subject of prisoner’s stumbling, either as having themselves provoked, or as having revived the recollection of the provocation in the field, such as it was, the interval of deliberation and premeditation was not a very long one; it was brief; but the cases of Mitchell and Dale sufficiently establish that that is not material. It is sufficient if the fixed purpose and deliberate premeditation to kill existed at the time of the assault.
We are, therefore, of opinion that the facts in the record will sustain the verdict of conviction.
With regard to the charge of the court the record informs us ■as-follows: “The court, it was admitted on all sides, charged *141 the law correctly, with one exception, to wit; Counsel for defendant requested the Judge to state to the jury, that if the defendant was drunk at the time he inflicted the wound, it would reduce the crime from murder in the first degree to murder in the second degree. But-the court stated to the jury, that drunkenness was no excuse or justification for any crime, and then read the act of Assembly to the jury, and left it to them to say, in the event they should find the defendant guilty of murder in the first degree, to state in their verdict, whether there was any mitigating circumstance or circumstances.”
The court was asked to charge as a matter of law, that drunkenness would reduce the crime of murder in the first degree, to that of murder in the second degree. The court in reply said, that drunkenness is no excuse or justification for any crime. The legal correctness of the general statement of the court is abundantly sustained by a long and unbroken series of authority in ancient and modern times, and by none more strongly and fully than by this court in the case refered to in Martin & Yerger's Reports. Whatever ethical philosophy may make of the matter, such probably, for stern reasons of policy and necessity, will ever remain the doctrine of .the criminal courts. But although drunkenness in point of law constitutes no excuse or justification for crime, still, when the nature and essence of a crime is made, by law, to depend upon the peculiar state and condition of the criminal’s mind at the time, and with reference to the act done, drunkenness, as a matter of fact affecting such state and condition of the mind, is a proper subject for consideration and enquiry by the jury. The question in such case is, what is the mental status? Is it one of self-possession, favorable to the formation offixed purpose, by deliberation and premeditation, or did the act spring from existing passion, excited by inadequate provocation, acting, it may be, on a peculiar temperament, or upon one already excited by ardent spirits. In such case it matters not that the provocation was inadequate, or the spirits voluntarily drank; the question is, did the act proceed from sudden passion, or from deliberation and premeditation? What was the mental status at the time of the act, and with reference to the act? To regard the fact of intoxication as *142 meriting consideration in such a case, is not to hold that drunkenness will excuse crime, but to enquire whether the very crime which the law defines and punishes, has in point of fact been committed. If the mental state required by law to constitute the crime be one of deliberation and premeditation, and drunkenness or other cause excludes the existence of such mental state, then the crime is not excused by drunkenness or such other cause, but has not, in fact, been committed. Even in England, where the crime of murder in the first degree has not been created and defined by law, it has been held in the case of The King vs. Griedly, (1 Russ, on Crimes,) that “though voluntary drunkenness cannot excuse from the commission of crime, yet when, as upon a charge of murder, the material question is, whether an act was premeditated, or done only wjth sudden heat and impulse, the fact of the party being intoxicated has been held to be a circumstance proper to be taken into consideration.” And in Pennsylvania, upon a statute similar to ours, (Pennsylvania vs. McFall, Adds. 257,) it has been held, that “drunkenness does not incapacitate a man from forming a premeditated design of murder, but as drunkenness clouds the understanding and excites passion, it may be evidence of passion only, and of want of malice and design.” But the bill of exceptions informs us that the charge of the court was in all respects unexceptionable, except as to the point stated. We are, therefore, to suppose that the court when charging upon the nature and character of murder in the first degree, did charge whatever was proper upon the subject we have been discussing; upon the whole then, we have felt it to be our duty to affirm the judgment in this case.